Your honors, I'm Brian Wolfman. I'm the director of the Georgetown Law Appellate Courts Immersion Clinic. With the court's permission, Shreya Serena, a 3L law student in our clinic, will present argument on Mr. Hammock's behalf. Thank you. Ms. Serena, welcome to the Fourth Circuit. Glad to have you here. Thank you, your honor. You're not missing finals, are you? No. I didn't have finals this year. This might be your biggest final. It feels like it. Go ahead, counsel. Good morning, your honors, and may it please the court. My name is Shreya Serena, counsel for Appellant Terrence Hammock. I will begin by addressing Mr. Hammock's conditions of confinement claims under the Eighth and Fourteenth Amendments before proceeding on to his First Amendment claim. Can you start with the jurisdiction issue? Yes. Because I'm concerned regarding the jurisdiction issue. I know you all filed supplemental briefing, but it appears that what he's initially appealed was the April date. The decision from the district court's decision from April 1st, but then the formal briefing is discussing the decision, unless I got it mixed up from March. Yes, your honor. So, Mr. Hammock filed his appeal from the final judgment of the district court. That judgment, the April 1st order, dismissed the last remaining defendant in this case, Dr. Barnes. And under the 2021 amendment to the FRAP 3C1B rule, that is all he needed to put in his notice of appeal. Every preliminary ruling before that merged into that final judgment. And so, that is why this court has jurisdiction. But he's, in that one, he's specifically stating that he is appealing his medical indifference claims. He doesn't discuss anything regarding his free exercise claims or his conditions of confinement, which would have come from the March order, district court order. So, under the amendment, your honor, he only needed to state the final order that he was appealing from. And because that order asked the clerk to close the case, that was the final judgment expressly designated as such. And so, the March order regarding the conditions of confinement claim and the First Amendment claim merged into that and included that. And he attached the opinion of the court into that final notice of appeal that he put through. If there's no further questions on jurisdiction, I will address his conditions of confinement claims. Mr. Hammack was at the Baltimore County Jail for two and a half years. During this time, he was served rotten fruit and meat with mice bites. Mr. Hammack complained to defendants that this food made him sick, that he could not eat this food. But the defendants did nothing to address his concern. In fact, they told him to eat what he was given and that if he didn't eat this, he wouldn't get a different treat. Mr. Hammack also wrote a letter to the warden of the jail, defendant Gail Watts. He told her these exact same things, that the apples were always rotten on the inside and the outside, the meat had mice bites. That eating this food made him sick several times. That he could not eat this food and that he had complained, but nothing was being done about it. He had to stop eating this food because it made him sick several times. He started losing weight. To get by, he had to rely on funds from his family to purchase food from the commissary. Because Mr. Hammack has pled a serious injury and has pled that the defendants were deliberately indifferent to this injury, we ask that this court reverse it. Tell me what the serious injury is. The serious injury, Your Honor, is the fact that he got sick several times from eating rodent infested food. That he was served for two and a half years when he was at this jail. You know, that sounds terrible, right? There's no way to run a food service. But our precedents have a pretty high standard for injury. And they specifically address these sorts of food related claims, right? And there's both a frequency element to it and a severity element. So there's, you know, frequency of allegations of how long it goes on and then how severe the injury is. It looked to me like the case law is that just saying I got sick is not enough. It's not severe enough. But he could also show a risk, right, of substantial injury. But that seems like it would go back to the risk of getting sick several times. Do you think saying I got sick is a severe injury under our precedent? I think, Your Honor, if he had simply said I got sick, that might not have been enough. But he said he got sick several times. And he has also said that when he sent the internal grievance to defendant Watts that it is still going on. So the fact that he got sick several times and the fact that he kept getting this food for two and a half years. And that he couldn't eat it because he feared that if he ate it he would get sick again. Suffices to show a serious injury that he suffered at this jail. Because defendants knew about. So that's like the frequency does a lot of work because the severity doesn't do much work. So, Your Honor, because we contrue Mr. Hammock's complaint liberally. He's a pro se plaintiff. And the fact that he has said he got sick several times, that his meat had mice bites. And that the bread was moldy. The apples were always rotten. The fact that he got sick several times and the fact that he was afraid to eat that food again. Drawing that inference from his pleading in his favor. He has alleged sufficient facts to show that the injury was serious. And because the defendants were aware of it and they did nothing to address his concerns. We know that defendant Watts received those internal grievances. They were marked as such. He also received a response on which she was CC'd saying that his internal grievances were being processed as a form 200. Which is the last step of the administrative grievance process at this jail. That he would receive a response once the investigation in his claims had been terminated. He received no response. And so because the defendants knew about his injuries and his problems. And did nothing to address his concerns. This court should reverse and remand on Mr. Hammock's 8th and 14th Amendment claims. And also find that defendants are not entitled to qualified immunity. Because under this court's precedent in Schrader v. White. It is clearly established that inmates are entitled to safe and sanitary food. Nutritionally adequate food that is prepared and served under conditions that don't pose a risk to an inmate's health and well-being. Here food that has been chewed on by mice. And apples that are always rotten and bread that is moldy. That has already gotten him sick several times. Does not meet nutritionally adequate standard. If there's no further questions from this court on Mr. Hammock's 8th Amendment claim. I will proceed to his 1st Amendment claim. Mr. Hammock has also pled that he holds a sincere religious belief. He's a practicing Muslim. And that the prison's policy has substantially burdened his ability to practice his religion. By attending Juma classes or Juma worship services that are mandated by his religion. Juma services are group prayers that Muslim men are required to attend every Friday at around noon. And it is a time for sermon and worship for Muslim men. At that point the jail should have put forward a legitimate penological interest. Justifying infringing on Mr. Hammock's right to be able to practice his religion. That they have not done. They offered a reason in the district court. That of COVID-19. But we know that Mr. Hammock was at this jail for at least 6 months before the pandemic started. The defendants have not put forward a reason justifying why Mr. Hammock was not allowed to attend Juma services for those 6 months. The district court relied on another reason. Based on Mr. Hammock's complaint. That Mr. Hammock was in protective custody. But from the face of Mr. Hammock's complaint. We know only for sure that he was in protective custody in March 2022. Because it is the prison's burden to put forward a legitimate penological interest for the entirety of the period that Mr. Hammock complains about. In the first instance in the district court. And they have not met this burden. This court should not undertake a Turner analysis at this stage. And reverse and remand on Mr. Hammock's first amendment claim. Because it is also clearly established that inmates are entitled to freely practice their religion. Absent a legitimate penological interest. Which the defendants have not put forth. It would be premature for this court to undertake a Turner factor analysis at this stage. That is why we ask that your honor reverse and remand on Mr. Hammock's first amendment claims as well. Thank you. You reserve some time. May I please the court. I'm trying to lean over here. I think you can straighten it up now. Let me help you. There we go. There you go. Go ahead. May it please the court. Joseph Allen on behalf of Baltimore County. To start as appellant did with the conditions of confinement claim. The allegations and the complaints made by Mr. Hammock in his complaint. Are clearly insufficient. To meet the standard for. An extreme deprivation. Was standard reviewed at the district court use here. It seems as if maybe district court was going back and forth between. On a discovery on a. Summary judgment versus. A motion to dismiss. I was just a little confused as to what standard. In the. He just found that the. Allocations themselves were insufficient and didn't consider anything else. That would convert it into a motion for summary judgment. So on their face, Mr. Hammock alleges. In his original complaint. That he will one time. He got ill from eating. Rotten apples and or. A mouse bin sandwich. But his primary complaint, which we can all agree is not a constitutional. Violation is that he was served cold food when he expected to be served. You see it throughout his complaint and his supplements. That that is his. Primary concern. And also the main reason why he. Stop eating. The provided meals for. Either 28. Or the full 29 months. Out of the time he was in custody at the. Detention center. That's in his, in his complaint, he says, I stopped eating. The meals and I eat from the connoisseur. And I started losing weight. Because of that. So that he doesn't allege that his loss of weight was. Directly related to him eating. Contaminated food. He. Chose to stop eating. Provided food. And the commissary. Substituted for that. I would also know that. He's solely stopped because it was cold. That's that. Are you saying that? No, no. Your honor. I said. I heard you say that one time. He saw this. And then he stopped eating because of that. That's what you said. No. One time. He got ill. One time. He got ill. He said. In his complaint. He said he only got sick once. Correct. Just one time. Okay. Well, let me, let me explain. The appellant said that he. Claimed he got sick several times in the past. That. Comes from. The joint appendix.  Which is a letter. One of several. Attached to his. Supplemental complaint. Which the court treated as just an addition to his original complaint. In his supplemental complaint itself. He only said that it was the meals were cold. Okay. And in one of the letters that he attached to the. The supplemental complaint, which was ECF seven below. That is the only place where he says. And I quote. I got sick several times in the past. But. That's part of the record. Isn't it? Yes. Yes. Yes. Yes, your honor. This is summary judgment, right? Was the summary judgment. No, your honor. The. The court didn't reference the. Several times. In his memorandum. He said. One time. So it's not, it's not clear whether. The district court. Took into account. So we don't know what the district court did. Well, even, even if the. The court had considered. Mr. Hammocks. Complaint that I got sick several times in the past. That's still clearly inadequate. To meet the standard of an extreme deprivation. And that results in a serious illness or injury. Extreme deprivation. Well, you know, it's. I don't know. It seems to be rather off-putting to. Go to bite your sandwich or eat your food. And you see there. Mice or whomever, whatever. Beat you to the meal. That's true. I don't know about you, but I mean, I think, I think I would lose my appetite. What do you think? I don't think that's arguable, your honor. I would prefer not to. Prefer not to. You would not. That's not the question. It's not. It's a point where, you know, commissary is hard. You know, when you're locked up and you're away from, you know, you're put away and trying to get somebody to get you to the commissary. He said to the extreme that he had to do that in order to survive. That's losing weight. And he does talk about cold food, which I would, too. I don't know how you call it. Every meal was cold, and that's okay. But maybe that's not severe, but I suppose you can eat it. Isn't that pretty severe, just the frequency of it? I mean, you get these meals and, you know, you're just afraid. You go to some place. I mean, just think about it. If the rat is there, if the mice are there, they're also not only eating, but they're also eliminating, too. So, you know, the rat and mice droppings are all around, and you're eating. I mean, that's pretty dehumanizing, isn't it, don't you think? I can't speak to dehumanizing, Your Honor. Wow. Go ahead. Your Honor, if there were mouse droppings in his food on a daily basis, that would be dehumanizing. I agree with that. And that would be a constitutional violation, right? There are cases saying that, right? If there's mouse droppings in your food more than a couple times, it's a constitutional violation, but courts draw the line at a couple times versus more than a couple times. We have cases about that, right? Yes, Your Honor. And there's a case where an entire fried rodent was found in a meal, and that was not deemed to be the. . . I hope that wasn't the Fourth Circuit. What was that case? There aren't any. . . Was it a Fourth Circuit case? I believe it was a district court case. I think it was from Maryland. A district court. Yes. Well, there aren't any Fourth Circuit reported decisions that say what is the. . . Exactly, right. So now for us to look at it and see what is dehumanizing in terms of when you get food that you see that a rat or a mouse has already started the meal and eaten it, and then you serve that. Somebody says, give me a tray. You may say, here, this is your meal for the day. And then you see a mouse or a rat has eaten from that. They carry rabies, don't they? As a matter of fact, I think the rabies are in their saliva. I don't know about that. That's what you've got to know a little bit about science. When we come to these cases, you talk about whether or not something is dehumanizing, what the threat is. You've got to know what the severity is. You ought to know something about rabies, don't you? I think it's about through the saliva. Saliva gets in terms of, you know, that kind of thing. But anyway, never mind. But go ahead. Argue your case. A detainee or an inmate still has to allege that they actually suffered a serious illness or serious injury from eating the contaminated or otherwise inadequate food. Mr. Hammack didn't do that here. He claimed that he got ill one time, even assuming that the I got sick several times is included in his complaint. That's not enough. And the appellant realized that. Is it the case that for this entire period the objective severity standard is the same, right? The intent standard, the mental state, is different when he was a pretrial detainee. That's an objective standard. And after he was convicted, that's subjective. But my understanding from our short decision is that that's the only thing that changes between being a pretrial detainee and a convicted prisoner, and that the objective severity standard is the same across the entire period, to rise to the level of a violation, whether we're talking 14th Amendment or 8th Amendment, directly as a punishment. The standard for serious or significant physical or emotional injury or a substantial risk of that injury is the same across the period. Is that right? Right. Short didn't change that, and it's not pertinent to this case because the judge never reached the deliberate indifference, as to each individual defendant, officer or official, because the pleadings were found to be inadequate on the constitutional violation itself. So whether each Director Watts or other individuals were deliberately indifferent to that. Right. That analysis wasn't done because it said as a matter of pleadings it was not sufficient. Right. Right. It's almost as if it was a 12B6.  Almost. Wasn't it? In that sense? Yes. It was.  Right? He treated it as a motion to dismiss, even though he talked about, in the opinion, that he could convert it to a motion for summary judgment. Although he denied the request for the discovery by Mr. Hammond. He didn't go outside the pleadings. He did not go outside the pleadings.  On the free exercise claim? On the free exercise claim, it's the same. Except for he considered the county's argument on COVID-19, which is not in the pleadings. Well, that's what I'm... It seems like on the confinement claims that there is 12B6. And then it seems like on the free exercise that we're at summary judgment. So I'm just... That's why I asked that question earlier about just where are we in terms of standard of review? I believe both are on the motion to dismiss stance. The main thing that the judge considered in the free exercise context was the attachment to Mr. Hammond's supplemental complaint that was the denial slip for his request to go to group Islamic services. So the judge took into account that the argument that Mr. or the claim that Mr. Hammond made in his supplemental complaint that was... This is the reason why I was denied the ability to go to group religious services. Why was he denied before COVID? Well, it's not in the record, Your Honor, but there is... So if it's not in the record, could the district court grant summary judgment or a motion to dismiss against the plaintiff? Yes. And this is why. Even though the court did find that there were legitimate penological interests in the COVID-19 and in him being in protective custody for at least part of the time, the Firewalker Fields case is right on point here. And I would propose... No, it's not. I know Firewalker very well. In that record, they provided a rug, prayer rug, and a schedule. I mean, there were a lot of things that went as accommodating his religious practice and his worship. Here, you don't have anything except that COVID maybe, or maybe I'm protecting him from being a protected person. That's different. Firewalker is totally different than this. You don't have those kind of facts here. I would disagree, Your Honor, because Mr. Hammond did not allege that his individual freedom to exercise his religion or his religious practices wasn't infringed at all. And in that circumstance, like the language... In other words, he didn't allege that he wasn't provided a prayer mat or that he wasn't allowed to pray. He only alleged that he was not allowed to go to group Islamic services. And I would... So on that record, then, that's what he required for his religious practice. Firewalker, in a sense, that those things were accommodating a part of what he wanted, correct? There's no evidence here, at this point, at least at this juncture, that he wanted anything other than the group prayer at noon on Fridays. That's required. That's what he wanted, and that's what the plaintiff inmates in Firewalker wanted also. And so they were provided with the means and ability to practice their religion individually. And Mr. Hammond didn't allege that he wasn't. But, like, we can't evaluate. Like, Firewalker Fields gets into evaluating whether what the prison's reason for not letting him do one thing and whether they accommodated his religious concerns in a different way. But here we have no reason. There's no reason. We can't evaluate a nonexistent justification for the prison policy or decision that we're presented with. Can we? I mean, isn't that what's missing here? For the brief period of time when he was supposedly not in protective custody or the Code 19. I mean, supposedly, yeah. You haven't said he was in protective custody. Because I read your brief with great interest to find out if you would take a position even outside the record, and you don't, which I guess you can't because there's no record on it. But we don't have anything to go on. We can't evaluate a policy that hasn't been presented to us or justifications that haven't been presented to us. I would say that Firewalker Fields stands for the proposition that there is no constitutional right to group religious services. And I quote from that decision, the relevant question is not whether the plaintiff had the opportunity to engage in Friday prayer on his terms, but whether he could generally engage in worship. Here, Mr. Hammack did not allege that he wasn't generally able to worship. It's not in his complaint. Was that the grounds of the district court's decision? Yes, Your Honor. Yes. One of the grounds was that they gave him, I thought you said that he was in protective custody and COVID was sufficient to say that that's why he was being denied. He didn't go into that analysis in Firewalker and those things or even inquire there, did he? He did quote extensively from Firewalker. Yeah, he did. Because he was quoting in terms of things that were used to assess the policy that was at issue. But that's not in this case at this point. I mean, you basically, you would judge Russian points. That is, I thought that that would be what you put in. Look, here's why we didn't do this. Here's what he was allowed to do. Nothing. So I guess I presume the inferences that you allowed him, he did nothing. You allowed him to do anything. That would be, because all the inferences are against you, right? So therefore, since you didn't put that forward, maybe you didn't allow him to do anything. Nothing. Now, you're trying to take advantage of, if I say nothing, now you've got to assume everything Firewalker was, I did that for them. You can't do that. That's what I meant. It's the opposite in terms of choosing Firewalker. Just to dump that in your case and say, look, you see, when you do all of this, it's fine. But you don't have that before us. We don't know what it was. We're dealing with a person who was in his cell by himself. In his cell and not doing anything. As far as we know. He didn't complain about that, Your Honor. And that's what we have to start with is the actual words of the complaint and everything else that was incorporated into it, like his supplemental complaint here. He had the opportunity and the motivation, if he wanted to complain about not having a prayer rug, for instance. He didn't do that. The only complaint he made, which is why I'm not asking you to make any assumptions about his individual practice, is he didn't complain about it. Okay. Your logic is, in terms of formal logic, would be because he didn't complain about that aspect, did it mean that he must have been getting it? I mean, it's not before the court, is my point. Yeah, but the point of what he did say is that he couldn't go to the Friday services, right? He wasn't allowed at noon. This was required in his religion. But he's not entitled constitutionally to any particular religious accommodation, right? That was in Firewalker, where they had no group-led, no inmate-led group meetings of any kind. They wouldn't let max security prisoners out to congregate. But they did do this. But they did have the- But you don't have the, but they did do this. That's missing in this case, at this point. Yes. But you want us to fill in the blank that you did all of those things, right? No, I want you to- Oh, you're saying that it's okay if all they did was, okay, we deny you for reasons of COVID or because you're in protective custody, and we do nothing else, that's fine. If that's the inference to be drawn, that would be okay. District Court said, yeah, under Firewalker, you don't have to do anything else. The fact that he asked for this, you know, and therefore, if you did nothing else, that's fine. I think a bare minimum explanation for the denial of group religious services would be sufficient under the Constitution. For example, the Firewalker fields, they relied on outside volunteers for any of their group religious services to be run by them. And if there was no volunteer for the Islamic services, then that was sufficient. That was a sufficient explanation, is that we don't have, and there's no obligation- What's your record, though, here, on your side, your ledger? You come here with a tabula rasa and saying that we're going to give you everything. We got to assume that you did the same thing that was available for him? Maybe it was, but you have to assume that because it's not in the record. Even with a pro se complaint, Your Honor, the plaintiff has to put forward what the claims are that he's complaining about. And here, the only thing he complained about was not being permitted to go to group Islamic services. And it sounds like you're, as I understand it now, today, your argument is as a matter of law, it does not violate the First Amendment to deny a prisoner access to group religious services, period. No matter what else you give them, whether you give them something else or you don't. Is that your position? It's a legal question. You can deny a prisoner the right to go to religious services full stop, so he's failed to state a claim. In a circumstance where the detainee or the inmates generally are provided adequate opportunity to practice their religion individually. So that's the part we have to know. Right, so you're not making the legal argument that he didn't state a claim by just saying I was denied access to this group service. You're saying it depends on the justification and what else the prison offers and all these other things that we don't know, because we don't know the justification and we don't know what else the prison offers. Well, Your Honor, I would say that I am saying that there is no constitutional right to group religious services, because if there was in firewalker fields, that denial of services would have been found to be unconstitutional. It's in a circumstance where there is no allegation, right? This is coming from firewalker fields. That he was prevented from engaging in individual religious practices, the claim fails, because the pertinent question is not whether the inmates have been denied specific religious accommodations. Was that on a motion to dismiss in firewalker fields that he, like, because of his allegations, he didn't allege all the good things the prison gave him, and so it was thrown out? I believe so, Your Honor. Or was it based on evidence from the prison of what they said was their policy, why their policy was a certain way, what else they offered? I don't know if those explanations came from the motion to dismiss. In that case, or if there was a record developed outside of that. But here we have just the COVID time and no explanation for before or after from the prison. Yes, Your Honor. But I have to come back to firewalker fields. Because he didn't allege that his individual religious freedom was infringed on at all. Oh, he did allege that, you know, he did allege that, maybe not. He did allege his religious beliefs and practices were infringed upon. Not his individual freedom to practice. He's alleging, and that was the distinction that firewalker fields made. If you've got a prayer mat, you can pray when you want to pray. You can even do Friday prayers at the appointed time. You just can't, or you're not. I'd like somebody to say that they wouldn't allow me to have Holy Communion. And you say, well, you know, it's not about the individual, but someone normally ministers to you, right, the Holy Eucharist? But you'd say, well, you didn't say, you only said you're an individual. But if you say, well, no, I'm not going to allow anybody to come in to administer, wouldn't it? Well, there's no constitutional right to have a priest come in and give Holy Communion. Or it's not? You don't have to provide? People who are Catholics who are incarcerated don't have to provide for them, for other religions? No. At all? The jail or prison doesn't have to go out and get someone from the community to come in. If that's provided for other religions, services? Well, that came up in firewalker fields also. Because firewalker fields was assessing what was done there. Here you want to take a record where you have put nothing in and get to an incredible opinion that says no. Otherwise, it's full stop there. We don't have to say we're doing anything. Unfortunately, Your Honor, the only argument made in the motion to dismiss was related to the COVID-19 pandemic. The judge expanded on that explanation by referring to Mr. Hammock's own pleading and the attachment thereto to decide on that issue. And what did you put in the record that it was based on COVID? What did your side put that in? In the motion? Just the motion to dismiss. Yeah, or in the alternative for summary judgment. Right. I mean, any evidence of it? I mean, that was a majestic response from lawyers. That's it? That's it, Your Honor. Nothing is on the floor. Yeah, argument.  Your time is well over, but if you have something to say in the next 30 seconds, you may. Go ahead. No, thank you, Your Honor. All right. Thank you, Your Honors. I will begin by addressing the two claims that opposing counsel made, one about the Eighth Amendment claim and one about the free exercise claim. First, as to the risk of injury that Mr. Hammock suffered, the Supreme Court has recognized in Helling that an inmate does not have to wait for something tragic to happen to the extent that if they know, for example, that they're drinking contaminated water, they don't have to wait for dysentery before they can make out a claim for injury. Here, Mr. Hammock got sick several times, and he saw mice bites on his food. A fair inference can be made that he was disgusted by that. He got sick from it, and he didn't want to eat it again, and he likely thought that if mice have access to this food, God knows what else they have access to in terms of what he was given to eat. As to the free exercise claim, Firewalker- You're right that there doesn't have to be an existing injury. The Supreme Court's expanded it to say a substantial risk. But in assessing the substantial risk here, it's a risk of, seems like it's a risk of what happened in the past happening again, right, which we know is I got sick. We don't know anything else about that. That there's a risk of that happening, and then potentially, he said, I started to lose weight. There's potentially that as a risk in the future. But that seems to be the universe of risks we're talking about, isn't it? Yes, Your Honor. And so for the injury element of the deliberate indifference claim, it has to be a serious injury or a substantial risk of serious injury. So those are both parts of Mr. Hammack's injury here. He actually did get sick several times, and he was exposed to this risk continuously when he was served this food for two and a half years. And it's your position that any version of getting sick rises to the constitutional level of a serious or significant physical injury? Like Your Honor said before, it depends on how many times it happens and whether there's a credible risk of getting sick from the food or other conditions of confinement. Does it depend on the severity of the sickness? We have some cases, you know, that are cited in the briefs about that. Yes, Your Honor. It depends on how many times it happens and the severity of the illness. So the burnt rodent case that opposing counsel talked about, the inmate received a burnt rodent in their meal one time. They didn't eat it, but that was the claim. And obviously that case was not appealed, but here he has mice bites. He's gotten sick, and he was exposed to this for the entirety of the period. The inference is that rodents have access to his food, and that creates a risk of foodborne illnesses. And so he has sufficiently pled that he suffered a serious injury. So you disagree with the cases that say a few times instances of mice droppings and mice evidence in food one or two times doesn't rise to a constitutional violation. You would disagree with that because if there's any evidence of mice, that would give a suggestion that they have access to everything and they've been there for a long time. So we would have to disagree with all of the circuit courts that have said a couple of instances of that is not a constitutional violation. So in those cases, either the jail did something to address the problem of, for example, maggots in food. The jail did something to address the problem. Whereas here, after complaining for two and a half years about this repeatedly, nothing was done to address his concerns. Sorry, I don't want to hold you up on that articulation. Did he complain for two and a half years? I saw complaints shortly before and after he filed his complaint in this case. Did he complain at the very beginning in 2019? So in his complaint, he talks about how he has complained multiple times or several times to defendants, and they've done nothing about it. While we don't know exactly how many times he complained, I think we can draw an inference that it was definitely sufficient times to defendants and to the warden specifically, enough times for them to – they should have taken notice. There seemed to be multiple complaints clustered around a certain time period in 2023, right? Is that – I think that's the year 2022, 2023. So it's 2019 to 2022. And in the complaint, he talks about how he has been complaining since he got there and nothing has been done about it. And in the letters to defendant Watts, he also says those things, that I have been complaining. I don't know if you got my Form 118. Because he talks about I've been complaining. I took my cold tray back to the cafeteria line and asked them to warm it up, and they wouldn't do it. So he's definitely complained to those individuals was the allegation. Yes, Your Honor, and he's definitely told them that he can't eat this food. And so an inference can be drawn that the fact that, A, there were mice bites on his food, the apples were always rotten, the bread was moldy, and the fact that he was exposed to this for two and a half years, he has made a claim for injury. As to the First Amendment claim, I will first address that Firewalker Fields was on a motion for summary judgment. And so there was a record there. The prison had offered a legitimate penological interest to which the court applied the Turner factors to assess whether the offered legitimate interest was reasonable. Where one has not been offered for the entirety of the period complained of, as is the case here, it is premature for the court to engage in the Turner analysis because we don't know what the – we don't know what the prison's policies were during COVID. When it's – were they offering any congregate worship services? Were other religions being accommodated? When did the restrictions start to loosen? We know in the real world those restrictions were evolving. Was that happening in the prison? We don't know anything about that. As to the protective custody claim, from Mr. Hammack's pleadings, one can infer that he was allowed to go to the law library a few times from September 2019 to December 2019. And so to the extent protective custody at this prison means that an inmate cannot interact with other inmates, the fact that he was allowed to go to the law library where his complaint says there were other inmates there undercuts the reasoning that even if he was – even assuming he was in protective custody, that couldn't have been the reason. That wasn't even put forth in the first place, and maybe that's why it wasn't put forth in the first place. Finally, Your Honor, I would also like to say the jail put the religious services memo in Mr. Hammack's protective custody unit. So to the extent protective custody means that inmates can attend religious services or go to religious services, we don't know why that memo was in a protective custody unit at all. If there are no questions from this court, I would ask that this court reverse and remand on Mr. Hammack's claim and also ask that the district court reconsider appointing counsel for Mr. Hammack to assist him with discovery. Thank you. Thank you, Counsel. Thank you, Your Honor. I just want to note to Mr. Wolfman, thank you so much. The Hoyas were well acquitted today and heard from. And would you please give your name for the record? I know you must have had something to do to help with this here. Elizabeth Brownstein. And you're a student as well? Yes, sir. Well, good. Good to have you both. Thank you, Professor. Appreciate it. Of course, appreciate the efforts of also Mr. Allen as well. All right. We'll come down and after you adjourn the court. We'll adjourn the court. We'll adjourn the court until tomorrow morning. The Zonal Report stands adjourned until tomorrow morning. God save the United States and the Zonal Report.
judges: Roger L. Gregory, Allison J. Rushing, DeAndrea Gist Benjamin